RICHARD WOLF et al., Respondents, v. CITY OF NEW YORK, Appellant.

First Department, March 13, 1975.

*Nina G. Goldstein* of counsel (*L. Kevin Sheridan* with her on the brief; *Adrian P. Burke, Corporation Counsel*), for appellant.

*Joseph P. Napoli* of counsel (*Joseph B. Castleman* with him on the brief; *Harry H. Lipsig*, attorney), for respondents.

CAPOZZOLI, J. The proof in this case demonstrates that the plaintiff, a 26-year-old man, had been interested in the New York City Fire Department for many years. He lived in New Jersey and was a volunteer fireman in a town in that State. He had hoped to become a New York City fireman and, in January, 1969, the plaintiff began frequenting a New York City fire house in Harlem, which housed Engine Company 58 and Ladder Companies 26-1 and 26-2. He brought with him his equipment, which he used as a volunteer fireman. It consisted of rubber boots, rubber coat, rubber gloves and a helmet, all of which did not differ much from the uniform of a New York City fireman, except that the coat was black with orange bands and the helmet was black with white stripes running from top to bottom and from left to right, with a black shield. The helmet of a New York City fireman is black and does not have white stripes on the crown, as did the plaintiff's.

On each occasion when he presented himself at the fire house above mentioned he would get permission from the person in charge to ride the equipment to the scene of a fire. That had been the practice which he followed from January, 1969 up to the time of this accident, August 2, 1969. He slept at the fire house on a number of weekends, ate there and chipped in for food with the regular city firemen.

Although he had attended a number of fires with the men he had never entered a burning building, nor was he ever on the roof of a burning building. He would remain on the ground and help pull the hose off the truck into the first floor. He did not know that it was against department regulations to go into a burning building unless ordered to do so by a supervising officer.

On August 2, 1969, at about 9:30 P.M. an alarm came in and the officer in charge, Acting Lieutenant Scollan, give plaintiff permission to ride the equipment to a fire at 310 West 121st Street, a five-story nonfireproof building. The full complement for this company was approximately eight to nine men and on

this night only six attended the fire. The plaintiff wore his rubber boots, rubber coat, rubber gloves and the rather distinctive helmet. Lieutenant Scollan stated that the plaintiff did ride to the fire with him and the others, in the same vehicle.

The plaintiff testified that, after they arrived at the fire " I stood on the chrome plating on the truck just observing, and I was given an order to bring some equipment up to the roof

" Q. Who gave you that order?

" A. Fireman Enzo (E N Z O).

" Q. Is his last name Brun or Brum?

" A. That's correct."

The plaintiff said that the equipment that he was asked to take up to the roof was a " hallogen tool " and he described it as a tool which helps you open up doors and break locks and is made of a steel bar, with a point on the one end and claw hook on the other and is approximately three feet long. In addition to this instrument he also took a six-foot pipe pole and a can of gasoline for the power saw. He followed Fireman Brun onto the roof of the building adjoining the one on fire. They eventually got to the roof of the building where the fire was taking place by going through the skylight door and across the roof, over a small 18-inch parapet. During all of this time Fireman Brun led him and he followed.

Lieutenant Scollan was on the roof of the fire building with several other firemen from his company. At this point the record shows the following:

" Q. After you arrived there what did you do with the equipment that you had brought up?

" A. I handed it out to the men that were on the roof when they needed it.

" Q. Now, how would you know if they needed it?

" A. They would call me over with the equipment and say, ' Richie, bring me the pipe hold, or bring me the hallogen tool, or bring me the can of gasoline so I can put it in the power saw.' * * *

" Q. Did you do any work yourself?

" A. Yes, I did.

" Q. At whose request?

" A. I believe it was Mr. Scollan.

" Q. Was it dark on the roof?

" A. Yes, it was.

" Q. Now, will you tell his Honor and the members of the jury what you were doing and with what equipment?

" A. Well, Fireman Scollan asked me to come over with the pipe *hole* and pull up part of the roof with the saw.  Cut an outline.

" Q. Did you do that?

"A. Yes, I did.

" Q. And at any time after that how long were you doing this sort of work?  *  *  *

" A. I think about fifteen, twenty minutes?

" Q. On the roof?

" A. Yes.

" Q. With the members of your Ladder 26 Company there?

" A. Yes."

The record further shows that, while the plaintiff was engaged in this work, personnel of other companies joined the ones with whom the plaintiff was working.  This is evidenced by the following:

" Q. Now, did there come a time when personnel of other companies were on the roof?

" A. Yes, there were.

" Q. Do you recall if any were ranking officers other than acting officers?

" A. I don't recall."

At pages 172–173 of the record there is the following:

" Q. Mr. Wolf, you testified it was about an eighteen inch parapet around the exterior of the roof and between the building, is that correct?

" A. On the one side there was one I climbed over it was, yes.

" Q. And was there any other parapet over there on that roof at that time?

" A. One that was about thirty inches high.

" Q. When did you first see that parapet?

" A. When he told me to get off the roof.  *  *  *

" Q. When did you first see that parapet?

" A. When he pointed and said, ' Richie, get off the roof '.

" Q. Who pointed?

" A. Mr. Scollan.

" Q. What did he point to?

"A. He pointed in the direction as if there was a way to get off the roof."

Beyond question, there is sufficient proof in this record to support the unanimous verdict of the jury in favor of the plaintiff.  The questions of fact raised in the record were strictly for the jury to pass upon.  In considering these questions the jury must have found that the presence of the plaintiff on the roof,

assisting the firemen in their work, was known to Lieutenant Scollan and the others. As indicated above, the plaintiff was led to the roof by Fireman Brun and he was on that roof with Lieutenant Scollan and the others for about 15 or 20 minutes. During this time, according to the plaintiff's testimony, which is undenied in the record, he was addressed by Lieutenant Scollan on several occasions with directions to bring various tools to him. After all, they were all working in about the same area, as is indicated by the testimony, and it is difficult to challenge the reasonable conclusion that Lieutenant Scollan knew that the plaintiff was there. This is especially so when one recalls that the company was two or three men short on this occasion and it is easily understandable why this anxious, willing, but untrained, firebuff was pressed into service.

It is contended by the defendant that the first time Lieutenant Scollan knew the plaintiff was on the roof was when he ordered him to get to the street and that he was surprised at his presence. Was that surprise real or feigned? It should be recalled that Lieutenant Scollan directed the plaintiff off the roof, pointed in the direction which plaintiff followed, after the arrival of firemen from other companies. Conceivably, the jury could have concluded that it would have been embarrassing for Lieutenant Scollan, as a commanding officer, to have it known that he permitted this firebuff on that burning building, in violation of regulations. It may well have been for this reason that he decided to get the plaintiff off the roof and to deny knowledge of his presence prior thereto.

In any event, this plaintiff cannot be treated as a trespasser on that roof and there is no contention that he was. On the contrary, he was there by invitation, if not direction and, at the very least, when his presence no longer was permitted on that roof, Lieutenant Scollan should have provided an escort to a safe passageway from the roof to the street. The record shows the conditions which existed on this occasion. There was darkness, no lights, except that which came from the fire, and " very smokey ". To have abandoned this plaintiff to his own resources under the circumstances disclosed, knowing that he was not a full-fledged fireman, and had had no training, nor experience, in fighting a fire from the roof of a five-story building, was, to say the least, gross negligence and carelessness, if not an exhibition of callous indifference to the plaintiff's safety. The consequence of this carelessness is best described in the words of the plaintiff when he tried to leave the roof.

"Q. On your way to leave the roof tell us what happened?

"A. In the process of trying to get off the roof I become disoriented in the way I came up. I didn't know where I was. I saw two other firemen on an adjoining building and there was a wall maybe two feet, twenty-eight inches high like a parapet wall, and I assumed there was a roof on the other side which I could walk across and then go down the stairwell." This is the typical reaction which would be expected from an untrained, inexperienced individual under the circumstances disclosed and it should have been foreseen by Lieutenant Scollan and the other firemen.

The whole basis of the defendant's contention to set aside the verdict is found in its insistence that the plaintiff, as a matter of law, was guilty of assumption of risk and contributory negligence. These are nearly always questions of fact for the jury and especially so in this case. The verdict of the jury could have gone either way.

In *McEvoy* v. *City of New York* (266 App. Div. 445, 448) the court said: " While contributory negligence may consist of the manner in which an act is performed, assumption of risk is never dependent upon the manner of performing an act but rather consists in the actual doing of the deed with foresight of the consequences. The essential requisite to the invocation of the application of the doctrine of assumption of risk embraces not only a knowledge of the physical defect but includes also an appreciation of the danger produced by the physical condition. [Citing authorities.] "

In the case at bar the act of which complaint is made is the failure of the defendant to exercise reasonable care in guiding the plaintiff off the roof or to a safe passageway leading from that roof to the street below. Surely the plaintiff did not assume the risk that he would be practically abandoned in finding his way off the roof under the dangerous conditions which existed. He had every right to rely on the belief that the men, who, for that night, were his comrades, all engaged in a common effort, knowing of his inexperience, would exercise reasonable care over his activities. Under these conditions I cannot understand how the doctrine of assumption of risk can play any part in this case. In any event, the jury said there was none.

As to the claim of contributory negligence in the *McEvoy* case (*supra,* p. 449) the court said: " At common law, whether or not a party has exercised due care is almost always a question of fact " thereby reasserting a principle of law which has governed our litigation in cases involving negligence over many years.

This plaintiff had the right to presume that those who were engaged with him in the work then going on would not expose him to danger, but, on the contrary, he was warranted in believing that Lieutenant Scollan and the others would act in accordance with the rights and duties of all.

The language of the court in *Friedman* v. *City of New York* (25 N Y 2d 764, 765) is particularly applicable to the case at bar: " On these facts, however, both the question of defendants' negligence and the question of plaintiff's contributory negligence were for the jury since plaintiff's knowledge of the danger and the presence of an alternate route were circumstances from which the jury might or might not infer negligence on the part of the plaintiff [citing cases]. Since reasonable men could differ as to whether or not the inference of negligence should be drawn in these circumstances, it cannot be said as a matter of law that the plaintiff was contributorily negligent ".

The plaintiff did not know of the existence of an airshaft and he felt he could rely on Lieutenant Scollan's directions and assume that he was ordering him into an area of safety.

In conclusion, the order of Appellate Term should be affirmed, with costs and disbursements to plaintiffs.

TILZER, J. (dissenting). I agree with the dissenting opinion of Mr. Justice NUNEZ but would reverse for still an additional reason. The testimony established that the plaintiff, who voluntarily entered upon the roof without proper authorization, had previously attended numerous fires, being permitted to ride on the fire truck and assist New York City firemen in ground-level activities. Further, plaintiff also served as a volunteer fireman in New Jersey, which also involved fire fighting training. It is therefore apparent that plaintiff was aware of and appreciated the dangers involved when he voluntarily took it upon himself to climb to the roof of a five-story building, at night, and engage in fire fighting activities. And, the risks which were knowingly assumed, included not merely the possibility of being burned or of the building collapsing, but also the possibility that the plaintiff would trip over equipment or even fall off the roof. Indeed, the plaintiff admitted that he knew that fire fighting is dangerous and he acknowledged that he was aware that firemen have been injured in various ways, including " [falling] down and injur[ing] [themselves]one way or another." As stated in the dissenting opinion of the late Mr. Justice QUINN in the Appellate Term, " The most obvious risk to be guarded against in ascending to the unfamiliar roof of a building at night is the danger of falling off ". I therefore

believe that as a matter of law the evidence established that plaintiff assumed the risks which resulted in the accident and accordingly, the complaint should have been dismissed. (*Eufemia* v. *Pacifico*, 24 A D 2d 673.)

Nor was there any evidence which could support the conclusion that plaintiff was given an assurance of safety when he was told to leave the roof, and accordingly, that he should be relieved from his own voluntary exposure to the risks which caused the injuries. The plaintiff merely stated that when Officer Scollan told plaintiff to leave the roof the officer merely pointed in a general direction and did not point to anything in particular. Accordingly, it is clear, as admitted by the plaintiff, that he was not directed as to the means of egress or any path to follow. It was therefore established that plaintiff was not relying upon an assurance of safety when he attempted to leave the roof and it must be concluded as a matter of law that plaintiff's unfortunate accident was not only the result of his own contributory negligence, but as above noted, plaintiff assumed the risks and dangers involved in his actions and hence, the defendant cannot be held liable. (See Distinction between Assumption of Risk and Contributory Negligence, Ann. 82 ALR 2d 1218.)

NUNEZ, J. (dissenting). I adopt, as my own, the succinct and excellent dissenting opinion of the late Mr. Justice QUINN in the Appellate Term holding that in striding over a 30-inch, almost hip-high roof parapet without looking to see what was in view on the other side, and plaintiff's own testimony that had he looked he would have seen the air shaft into which he fell, plaintiff was contributorily negligent as a matter of law, entitling defendant to a dismissal of the complaint.

In my opinion there is still another ground mandating dismissal. Plaintiff testified that it was fireman Enzo Brun who gave him permission to go to the roof by asking plaintiff to "give me a hand taking some equipment up to the roof." Fireman Brun had no authority to allow plaintiff to go to the roof. "For the purpose of preventing unnecessary jeopardy to civilians and interference with operations of members [of the Fire Department] at fires and emergencies," civilians may not be permitted to enter fire buildings "except by authority of the officer in command." (N. Y. C. Fire Dept. Reg. No. 11.5.23[d].) Concededly the officer in command was a Mr. Scollan. The record clearly establishes that Mr. Scollan did not authorize plaintiff to enter the burning building. Nor is there any basis for an inference that Scollan saw and recognized the

plaintiff in the building until just before telling him to leave the roof. On the contrary, the plaintiff himself testified to Scollan's surprise at seeing him on the roof just before telling him to leave. Scollan confirmed it.

The principle of nonliability has been applied in the case of private corporations, recovery being denied to a person who was unauthorized to engage in the activity which resulted in his injury. (See *Duschnik* v. *Deco Rest.*, 276 N. Y. 439; *Bernhardt* v. *American Ry. Express Co.*, 218 App. Div. 195.) Certainly defendant municipal corporation should have similar protection. Plaintiff entered the building knowing that he lacked the requisite permission of the officer in command. In so doing he was in violation of the Fire Department regulations having the force of law. As the Court of Appeals has most recently held: '' Before the defendant is cast in liability, it must appear that defendant breached a duty owed to plaintiffs, and such breach proximately caused the injury complained of. There is no showing of defendant's knowledge of any likelihood of plaintiffs' presence at such times as would amount to an acquiescence from which defendant's consent could be inferred.'' (*Warmsley* v. *Long Is. Banana Co.*, 35 N Y 2d 953, 954.)

While I deeply sympathize with plaintiff's tragic plight resulting from the accident, I am bound by the rule of law as I see it and vote to reverse and dismiss the complaint. Were I not so persuaded I would hold that the verdict is against the weight of the credible evidence. Although the difference between assumption of risk and contributory negligence often eludes me, as it does in this case, I concur with the view expressed by Mr. Justice TILZER.

MARKEWICH, J. P., and LUPIANO, J., concur with CAPOZZOLI, J.; TILZER and NUÑEZ, JJ., dissent in separate opinions.

Order of the Appellate Term, First Department, entered on May 29, 1974, affirmed. Respondents shall recover of appellant $60 costs and disbursements of this appeal.